# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARY WHITESELL, CYNTHIA** )<br>**KILDOO AND LEANN RICHTER,** )<br>Plaintiffs, )<br> )<br>vs. )<br> )<br>**DOBSON COMMUNICATIONS** )<br>**trading as CELLULAR ONE,** )<br>Defendant. ) | 2:06cv0319<br>**Electronic Filing** |

## MEMORANDUM OPINION

February 20, 2008

## I.     INTRODUCTION

Defendant, Dobson Communications trading as Cellular One ("Cellular One"), has filed a motion for summary judgment. After careful consideration of the motion, the memoranda of law in support and in opposition and the supporting materials supplied by the parties, this Court will grant the motion with respect to the claims brought by Mary Whitesell and deny it with respect to the claims brought by Cynthia Kildoo and Leann Richter.

## II.     STATEMENT OF THE CASE

Plaintiffs, Mary Whitesell, Cynthia Kildoo and Leann Richter, were all employed by Cellular One at its Butler, Pennsylvania store, Whitesell as an Assistant Sales Manager and Kildoo and Richter as Retail Sales Associates under Whitesell's supervision. All three bring suit, alleging that their respective discharges from employment constituted age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (ADEA). In addition, Whitesell alleges a claim of hostile work environment and harassment.

<u>Facts</u>

Dobson Communications provides cellular telephone service and calling plans to its customers in Pennsylvania under the licensed trade name of Cellular One. It employs significant numbers of individuals in multiple retail stores to market and sell cellular telephones, accessories and calling plans.

Cellular One asserts that every sales employee in the retail centers is expected to meet a

monthly quota of cellular account activations. The actual quota applied to each individual varied with the individual's position. Plaintiffs contend that this policy was not uniformly enforced and that employees under the age of 40 who violated the monthly sales quota policy were not terminated.

Whitesell was employed by Cellular One as an Assistant Retail Sales Manager from January 17, 2003 to November 10, 2004 at its Butler, Pennsylvania store. Kildoo and Richter were employed by Cellular One as Retail Sales Associates ("RSAs") and also worked in the Butler, Pennsylvania store under Whitesell's supervision. Plaintiffs worked in Cellular One's "North Region" which included a geographic footprint spanning Youngstown, Ohio to Clearfield, Pennsylvania. The North Region was further divided between two markets – Youngstown and the Lower North Pennsylvania regions. The Butler store is located in the Lower North Pennsylvania region.

Cellular One states that it follows a progressive disciplinary process for its enforcement of sales quotas by utilizing objective standards and multiple levels of review and approval before any disciplinary action is taken to ensure that sales quotas are enforced in a fair and nondiscriminatory manner. Sales employees who fail to meet quota face receiving a Written Warning or dismissal, regardless of their age or other classification, depending on what stage the employee is at in the progressive disciplinary process. (Def.'s App. Ex. A.)[1] Plaintiffs contend that this alleged policy is not uniformly enforced.

Upon hiring, sales representatives are provided a three-month training "ramp-up" period in which they are not accountable for meeting sales quota. (Menster Dep. at 52-53.)[2] Cellular One's sales disciplinary process for its North Region consists of a five-stage progressive disciplinary process as follows:

Stage 1: Verbal/informal Plan for Improvement
Stage 2: First Written Warning with Plan for Improvement
Stage 3: Second Written Warning with Plan for Improvement

---

[1]Docket No. 15.

[2]Def.'s App. Ex. B.

Stage 4: Final Written Warning
Stage 5: Termination

(Def.'s App. Ex. A.)

Cellular One's progressive disciplinary process included a six-month safe harbor provision in which the sales quota disciplinary process would restart if the RSA went six or more months without missing quota. (Menster Dep. at 54-55.) In extenuating circumstances, such as a prolonged absence due to illness or a death in the family, sales managers could seek the approval of the Regional Vice President to permit case-by-case variances from the sales disciplinary policy. (*Id.*) Plaintiffs contend that the relevant manager in this case, Bryan Clark, used his discretion to enforce the sales quota requirement in a discriminatory fashion.

During the relevant time period, it was the procedure of Cellular One's regional human resources department to send a monthly e-mail attaching a Detailed Summary Report for Activations ("Monthly Activations Report") to the Regional Vice President, General Manager, Area Manager and Sales Directors (both direct and retail). (Menster Dep. at 35-36, 56; see Def.'s App. Ex. C.)

Cellular One states that management was requested to review the Monthly Activations Report and identify sales representatives who had failed to meet quota. In addition, managers at all levels were to report to the human resources department if they were seeking approval to waive disciplinary action for any sales representatives who failed to meet quota. (Menster Dep. at 42-43, 50.) Plaintiffs respond that the Monthly Activations Reports Cellular One has submitted (Def.'s App. Ex. C) show repeated instances where no disciplinary action followed a failure to achieve sales quota.

Cellular One states that the regional human resources department also reviewed the Monthly Activations Reports and determined which stage of the disciplinary process was applicable to each employee who failed to meet quota and invited comment from managers if they disagreed with the suggested disciplinary response. (Menster Dep. at 60-62.) Plaintiffs contend that the regional human resources department only reviewed the decision of the sales manager to impose discipline, not when the sales manager chose not to impose discipline.

3

(Menster Dep. at 33-38.)[3]

All requests for terminations were reviewed and approved by the Regional Vice President, General Manager, Area Manager and Sales Directors and the company's corporate human resources department. (Menster Dep. at 60-62.)

Cellular One states that it also follows progressive disciplinary process with respect to the enforcement of its policies, procedures and work rules. However, it reserves the right to take an appropriate form of discipline depending on the infraction, including termination for gross misconduct. *See* Def.'s App. Ex. D. Plaintiffs respond that there were instances where the progressive disciplinary process was not enforced against others when it was enforced against them for the same behavior.

<u>MARY WHITESELL</u>

Mary Whitesell started her employment with Cellular One on May 8, 2000 as a retail sales representative in the Butler, Pennsylvania store. She was promoted to Assistant Retail Sales Manager for the Butler store on or about January 17, 2003. She understood that as an Assistant Retail Store Manager she was responsible for adhering to company policies and procedures, supervising the RSAs working in her store and meeting a sales quota which was tied to the store's overall performance. (Whitesell Dep. at 57, 61-64.)[4] Whitesell received training on Cellular One's policies and procedures and had received copies of its Employee Policy Manual. (*Id.*) She also received a copy of Cellular One's Supervisory Manual.

There were multiple layers of upper-management for the retail sales channel directing store operations. At the time that Whitesell was promoted to Assistant Retail Sales Manager, her direct supervisor was Kenneth Henke, who served as a Retail Sales Manager over several store locations in Pennsylvania through August, 2004. Kenneth Henke was replaced by William

---

[3]Pls.' App. (Docket No. 22) Ex. 5.

[4]Def.'s App. Ex. E.

4

Citeroni shortly thereafter.[5]  Kenneth Henke reported to Andrew Bryan Clark ("Bryan Clark"), the Director of Retail Sales for the Lower North Pennsylvania region from May 10, 2002 through February 22, 2005.[6]  In turn, Bryan Clark reported to Ron Smrek, the Area Manager for the Lower North Region.  The Area Manager reported to Cellular One's Regional Vice President, Slayton Stewart, and General Manager, Lisa Jenrette.

Between May 2003 and October 2004, Whitesell received four Written Warnings for various violations of company policies and procedures.  On May 19, 2003, she received the first Written Warning from her direct supervisor, Kenneth Henke, after she closed the Butler store during posted store hours without receiving management approval.  (Def.'s App. Ex. F.)  In response, Whitesell admitted that she closed the store, but explained that the store was closed for only three minutes due to an office equipment breakdown and supply shortage, that the store was unmanned and that no customers came in.  She argues that the warning was a pretext covering for age animus.

On January 23, 2004, Whitesell received a second Written Warning from her direct supervisor, Kenneth Henke, for a continued pattern of violating Cellular One's dress code. Henke noted that:

> In the past we have had discussions with you regarding the nose piercing you have and the fact that nose piercing is a violation of the dress code we have for our retail stores.  On 1/21/04, we had a discussion with you on this again and pointed out the importance of having your nose piercing covered or removed while you were working in our retail store.  However, despite our previous discussions, on 1/22/04, your nose piercing was not covered or removed while you were in the retail store.

(Def.'s App. Ex. G.)  Whitesell admits that she was aware at the time she received the Written Warning that her nose piercing violated the company's dress code.  (Whitesell Dep. at 64, 87-89.)  She testified that the General Manager for the North Region, Lisa Jenrette, brought the nose piercing to Kenneth Henke's attention and requested that he address the dress code

---

[5]Defendant notes that Kenneth Henke passed away in August 2004.

[6]Cellular One notes that his position was eliminated due to a corporate restructuring of its sales channels and is unrelated to any of the claims contained in the complaint.

violation. (Whitesell Dep. at 87-89.)

Whitesell argues that she had already agreed to remove the nose ring and would do so on her vacation. (Whitesell Dep. at 93.)[7] However, the Written Warning states that she was supposed to keep it covered until she had it removed, but that she failed to do so.

Whitesell also contends that the dress code policy was not enforced against employees under the age of 40. (Whitesell Dep. at 113.)[8] Specifically, she states that an RSA at the Butler store, Andrew Verostik, was not reprimanded for a having his eyebrow pierced. Cellular One responds that Verostik reported to Whitesell and it was her responsibility to seek the assistance of upper management to redress the violation. She responds that management above her was aware of Verostik's eyebrow piercing and chose not to enforce the dress code against him. (Whitesell Dep. at 113-14.) She argues that the warning was a pretext to build a record against her.

On September 10, 2004, Whitesell received a third Written Warning for her failure to protect company assets and for allowing phones to be sold at a sale price prior to the commencement of a promotion. (Def.'s App. Ex. H.) She does not dispute that she pre-sold phones prior to the start of the promotion, which was a violation of company policy. She explains that she made the decision, which was within her discretion, to sell phones at the sales price 10 hours before the sale was to begin as part of her managerial responsibilities and for the purpose of not losing customers, who had driven a considerable distance to her store in response to a promotional flyer. (Whitesell Dep. at 94-95.)[9] She contends that the warning she received for this act was a pretext for building a record against her.

On October 15, 2004, Whitesell received a Final Written Warning for using, or permitting another employee to use, her point of sale login for the purposes of accepting payments for her spouse's business account. (Def.'s App. Ex. J.) Cellular One notes that, on or about February 1,

---

[7]Pls.' App. Ex. 8.

[8]Pls.' App. Ex. 7.

[9]Pls.' App. Ex. 9.

2002, she had received an interoffice memorandum regarding Cellular One's Fraud Policy. Among the infractions considered gross misconduct subject to disciplinary action up to and including termination, Cellular One prohibited conducting business transactions under another person's login; failure to safeguard one's login to protect company assets; and entering information on one's own account, a friend's account, or a family member's account without approval. (Def.'s App. Ex. K.)

At the request of the regional human resources department, Jane Suber performed an audit of the Butler store's point of sale system after Bryan Clark had expressed concerns about misuse of point of sale logins in the Butler store. (Def.'s App. Ex. J; Suber Dep. at 31-33.[10]) Suber's investigation revealed that Whitesell had contacted Cellular One's customer service center to request a credit for her spouse's business account. The customer service representative advised Whitesell that she would need to get the approval of her manager to issue the credit. Further, upon review of Whitesell's spouse's account, Suber found that on several occasions there were payments taken under Whitesell's login, as well as an activation on the spouse's account. (*Id.*)

Cellular One states that, although Whitesell stated that she did not do the transactions, but had her employees enter them under her login, her behavior was in clear violation of company policy and procedures. (Def.'s App. Ex. K.) Whitesell does not dispute that she permitted her point of sale login to be used to accept payment on her husband's account. Rather, she responds that the use of company login by Cellular One employees to perform personal business was a common and accepted practice and she named numerous individuals who engaged in the practice but were not disciplined. (Pls.' Resp. Def.'s Interrog. No. 5; Whitesell Dep. at 102-03, 130-32, 140-41.)[11]

William Citeroni, who was Whitesell's direct supervisor, states that, while he worked for Cellular One:

_____

[10]Def.'s App. Ex. I.

[11]Pls.' App. Exs. 3, 12.

Mary Whitesell was written up for sharing her log in, yet Heather Craig had her log in posted on the computer terminal and I witnessed Bryan Clark simply remove it without any disciplinary action toward Heather. I investigated and reported Heather engaging in fraudulent activations to Bryan Clark. This behavior should have resulted in termination, yet no action was taken. Mary Whitesell called me and questioned why Bryan treated her and her employees so much differently than Heather and I told her that I was aware of that, but did not know why....

(Docket No. 27.)

Cellular One responds that Whitesell was disciplined for allowing a credit to be applied to her husband's business account through her own login, not merely leaving a login posted on a terminal as Heather Craig had done. (Def.'s Supp. Reply Br. Ex. A.)[12] In addition, it notes that Heather Craig in fact was terminated on February 2, 2005 due to reports of several fraudulent activities. (Menster Decl. ¶¶ 3-4 & Exs. A, B.)[13]

Both Jane Suber and Bryan Clark provided Whitesell with the Final Written Warning. (Suber Dep. at 32-33.) At the time Whitesell received her Final Written Warning, she signed an acknowledgment which provided, in pertinent part:

Since your behavior/performance continues to be at an unacceptable level, we are issuing this **Final Warning** that you need to obtain an acceptable performance level. Any further incidents of unacceptable performance/behavior will result in further disciplinary action, up to and including termination.

(Def.'s App. Ex. J) (emphasis original).

On November 10, 2004, Whitesell's employment was terminated for unacceptable performance after her store had achieved only 25% of its sales quota for the month of October, 2004. The termination letter provides, in pertinent part:

A review of records maintained by Corporate Human Resources Department at Dobson Cellular Systems, Inc., finds that you have received the following warnings for unacceptable behavior/performance:

- 5/19/03 Written Warning for Violation of Company Policy/Procedure.
- 1/23/04 Written Warning for Violation of Company Policy.
- 9/10/04 Written Warning for Violation of Company Policy/Procedure & Failure to Protect Company Assets.
- 10/15/04 Final Written Warning for Violation of Company

---

[12]Docket No. 32.

[13]Docket No. 32 Ex. B.

Policy/Procedure.

> Upon receipt of the warnings described herein, your present job performance has not improved because your sales channel had 58 activations out of a quota of 228 for the month of October 2004, which is an unacceptable sales performance level…

> …[D]ue to your continued pattern of unacceptable behavior/performance, we are terminating your employment with Dobson Cellular Systems, Inc./Cellular One effective November 10, 2004…

(Def.'s App. Ex. L.)

Prior to Whitesell's termination, Cellular One's human resources department sought the review and approval of the Interim Regional Vice President, General Manager, Area Manager, Retail Sales Director and the company's corporate human resources department. By email correspondence dated November 8, 2004, all approved of the termination. (Def.'s App. Ex. M.)

<u>CYNTHIA KILDOO</u>

Cynthia Kildoo started working for Cellular One as an RSA on or about November 19, 2002. She understood upon her hiring as an RSA that she would be subject to a monthly sales quota and that a failure to meet quota could lead to termination of her employment. (Kildoo Dep. at 28-29.)[14]

Kildoo received copies of Cellular One's Employee Policy Manual and annual Sales Compensation Manuals and received training on the company's employment policies and procedures. (Kildoo Dep. at 26-29.) On or about March 9, 2004, Kildoo received an annual performance review which was prepared by her direct supervisor, Mary Whitesell, and approved by Kenneth Henke. Whitesell noted that "Cindy's main goal and interests are to develop herself as a sales person. I have faith that the new sales process will greatly help her in attaining her goals." (Def.'s App. Ex. Q.). As noted in Kildoo's annual review, meeting quota prior to March 2003 had been challenging. Whitesell indicated that Kildoo, "[o]ccasionally meets quota. Fails to obtain consistently. Direction and supervision are needed to accomplish sales attainment." (*Id.*)

---

[14]Def.'s App. Ex. P.

On May 17, 2004, Kildoo received a Written Warning for failure to meet quota for the month of April 2004. The Written Warning had been issued by Whitesell. Included with the Written Warning was a "Plan for Improvement" which had been prepared by Whitesell. Therein, Whitesell stated that Kildoo should:

> On a daily basis, complete a minimum of 25 voicemail and/or text messages to our current customer base notifying them of current promotions, new features, special offers, etc.
> On a daily basis, ask for referrals with each new activation of service.
> On a daily basis, send out a minimum of 20 promotional flyers to former customers to persuade them to switch back to our service.

(Def.'s App. Ex. R.)

On June 10, 2004, Kildoo received a second Written Warning for failing to attain quota for the month of May 2004. (Def.'s App. Ex. S.) Again, the Written Warning was issued by Mary Whitesell and accompanied by a Plan for Improvement. Kildoo does not dispute that she failed to meet her monthly sales quota for May 2004. (Kildoo Dep. at 33.)

Kildoo received a Final Written Warning on October 14, 2004 for failure to attain quota for the month of September 2004 which was issued by Mary Whitesell. (Def.'s App. Ex. T.) On the Written Warning, Whitesell wrote, "Cindy failed to meet her quota **even at the 30% level.**" (*Id.*) (emphasis added). Whitesell further noted that any further failures to meet quota could lead to further disciplinary action, including termination.

On November 12, 2004, Kildoo was advised by Bryan Clark and his supervisor, Jane Suber (then serving as Cellular One's Interim Area Manager for the Lower North region) that her employment was being terminated. (Kildoo Dep. at 50-51.) She was handed a termination letter, which stated, in pertinent part, that:

> A review of your October 2004 sales indicates that you did not meet your sales quota again. Because of this continued pattern of unacceptable performance, we are terminating your employment with Dobson Cellular Systems/Cellular One effective today, November 12, 2004.

(Def.'s App. Ex. U.)

Prior to Kildoo's termination, Cellular One's human resources department sought the review and approval of the Interim Regional Vice President, General Manager, Area Manager, Retail Sales Director and the company's corporate human resources department. By email

correspondence dated November 5-8, 2004, all approved of the termination.  (Def.'s App. Ex. V.)

LEANN RICHTER

Leann Richter began her employment with Cellular One on February 13, 2002.  As with Kildoo, Richter understood upon hiring that she would be subject to a monthly sales quota. (Richter Dep. at 9.)[15]  Richter also received Cellular One's Employee Handbook, annuals Sales Compensation Manuals and training on the company's policies, procedures and work rules.  (*Id.* at 10-12.)

On June 10, 2004, Richter received a Written Warning for failure to attain quota for the month of May 2004.  (Def.'s App. Ex. X.)  The Written Warning was issued by Whitesell, who was also Richter's direct supervisor.  The Written Warning was accompanied by a "Plan for Action" which was identical to those prepared for Kildoo.  Whitesell further advised Richter that any future failures to meet quota could lead to further disciplinary actions, up to and including termination.

On July 14, 2004, Richter received a Written Warning which had been issued by Whitesell for failure to meet quota for the month of June, 2004.  (Def.'s App. Ex. Y.)  Richter received a Final Written Warning on December 14, 2004 for failure to attain quota for the month of November 2004.  (Def.'s App. Ex. Z.)  The Final Written Warning was issued by Bryan Clark because Whitesell's employment had been terminated the prior month.

Richter does not dispute that she had failed to meet her quota for the months of May, June or November, 2004.  (Richter Dep. at 32, 44, 47.)  On January 12, 2005, Richter's employment with Cellular One was terminated as a result of her failure to meet quota in December 2004. (Def.'s App. Ex. AA.)  Prior to Richter's termination, Cellular One's human resources department sought the review and approval of the Interim Regional Vice President, General Manager, Area Manager, Retail Sales Director and the company's corporate human resources department.  By email correspondence dated January 7-12, 2005, all approved of the termination. (Def.'s App. Ex. BB.)

---

[15]Def.'s App. Ex. W.

On January 20, 2005, Kildoo and Richter filed complaints with the Pennsylvania Human Relations Commission (PHRC), alleging that their terminations constituted age discrimination. On March 8, 2005, Whitesell filed her complaint with the PHRC. Plaintiffs have indicated that the PHRC never ruled on their complaints. However, because more than 60 days have elapsed since they filed these complaints, they have the right to file claims under the ADEA in this Court. 29 U.S.C. § 633(b).

Plaintiffs filed this action on March 16, 2006. Kildoo and Richter allege that, although they were told that they were being fired because they did not meet their quotas, this reason was pretextual in that the quotas were selectively enforced for employees over the age of 40, in violation of the ADEA. Whitesell alleges that Cellular One created a paper record of pretextual performance problems to justify her dismissal, which was actually motivated by her age. She also alleges that she was subjected to a hostile work environment based on her age.

On April 6, 2007, a motion for summary judgment was filed by Defendant.

## III.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Woodside v. School Dist. of Philadelphia Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001) (quoting *Foehl v. United States,* 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. *Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001); *Woodside*, 248 F.3d at 130; *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477

U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.    DISCUSSION

<u>Shifting Burden Analysis for ADEA Termination Claims</u>

The ADEA provides that it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of such individual's age if that individual is over 40. 29 U.S.C. §§ 623(a), 631(a). In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973) and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir. 1987) (en banc).

The Court of Appeals for the Third Circuit has indicated that, to state a prima facie case of age discrimination, a plaintiff must establish that he is at least 40 years of age, that he is qualified for the position, that he suffered an adverse employment decision and that he was replaced by a sufficiently younger person to create an inference of age discrimination. *Showalter v. University of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234 (3d Cir. 1999) (citation omitted). In a situation such as this one, a plaintiff can also satisfy the fourth element in this case by "showing that similarly situated non-protected employees were treated more favorably." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (citation omitted). *See McDonnell Douglas,* 411 U.S. at 804 (African-American who had engaged in an unlawful traffic obstruction as a form of protest at the employer's location could maintain a case of racial discrimination arising out of the employer's failure to rehire him if he could proffer evidence that he was treated more severely than white employees who had engaged in the same conduct).

If the employee presents a prima facie case of discrimination, the employer must

"articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. *Id.* at 804. The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

<u>Kildoo and Richter's Termination Claims</u>

Kildoo and Richter allege that their terminations constituted age discrimination. They are both over the age of 40, were qualified for their positions, suffered adverse employment decisions and contend that they were treated less favorably than similarly situated employees who were not in the protected class. Defendant concedes for the purpose of its motion for summary judgment that all three Plaintiffs can present a prima facie case of age discrimination. (Docket No. 16 at 3.) Thus, the discussion turns to Defendant's proffered reasons and Kildoo and Richter's evidence of pretext.

The burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for terminating Kildoo and Richter. Defendant's proffered reason for both terminations is that they failed to meet quotas sufficient times for the progressive disciplinary system to reach the termination stage. Specifically, Cellular One notes that: 1) Kildoo struggled to meet quota in 2003 and failed to meet quota for five months in a period of less than a year in 2004; and 2) Richter similarly missed her monthly sales quota for five months in a period of less than a year. These matters are documented and Plaintiffs do not dispute the facts. (Def.'s App. Exs. Q, R, S, T, U, X, Y, Z, AA.) Indeed, Kildoo and Richter admit that they failed to meet their quotas. (Kildoo Dep. at 33; Richter Dep. at 32, 44, 47.)

Thus, the burden shifts back to Kildoo and Richter to point to evidence from which a trier of fact could conclude that the proffered reason is a pretext for unlawful age discrimination.

14

They proceed along "*Fuentes* prong two" by pointing to evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1111 (3d Cir. 1997) (en banc). Specifically, they contend that other employees, who were under the age of 40, failed to meet quota, but were not terminated. They have submitted a list of Cellular One employees in the sales region under the age of 40 who violated the monthly sales quota policy yet were not terminated. (Pls.' App. Ex. 1.)

Cellular One contends that the evidence does not support their theory that quotas were selectively enforced against them because they were over the age of 40. It argues that they have not selected appropriate comparators because: 1) some of the named individuals (Amanda Ealy, Cathy Vinion, Laura Kaza and Robert Maltais) were Retails Sales Managers (a level above that of Whitesell); 2) some others (Shane Nesbit, Melinda Osman and Timothy Petrus) were Business Sales Managers or Account Executives; and 3) some of the other named individuals did not have Bryan Clark as a supervisor. Cellular One notes that Plaintiffs claim that Bryan Clark showed favoritism, particularly with respect to employees under the age of 40 at the Butler store location. (Kildoo Dep. at 36; Richter Dep. at 28.)

The first argument is correct, but the third is not and the second cannot be determined from this record. The term "similarly situated individual" does not mean "identically situated." *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir. 1991). In that case, the court rejected a university's argument that Bennun, a professor who was denied promotion to full professor, could not compare himself to Somberg, another professor who received the promotion, because Somberg was rated outstanding in two categories, teaching effectiveness and general usefulness, and Bennun was not rated as highly in these categories. The court held that "even if Somberg was a 'teaching-oriented' professor and Bennun was a 'research-oriented' professor, as Rutgers contends, a comparison between the two can be made to determine if Rutgers' five objective criteria for advancement to full professor were evenly applied." *Id.*

Thus, in this case, RSAs are clearly similarly situated individuals. On the other hand, Kildoo and Richter cannot compare themselves to Retail Sales Managers, for whom the quota

requirement appears to be based on that of the store as a whole rather than their individual performance. Defendant provides no support for its contention that the similarly situated individuals had to be supervised by Bryan Clark. With respect to Business Sales Managers, Cellular One argues that they "worked in a completely separate sales channel" (Docket No. 23 at 3), but it has not explained what this means.

Cellular One maintains that the history of terminated employees for the Butler store does not support Plaintiffs' theory that quotas were selectively enforced against employees over the age of 40:

> 5 Retail Sales Associates were involuntarily terminated between January, 2002 and May, 2006:
>
> - 4 Retail Sales Associates were involuntarily terminated for failure to meet quota:
>
>     ○ 2 Retail Sales Associates were under the age of 40 (Stacey Felix and Allison Maziarz)
>     ○ 2 Retail Sales Associates were over the age of 40 (Cynthia Kildoo and Leann Richter)
>
> - 1 Retail Sales Associate (Farron Sonner) who was under the age of 40 was terminated for non-quota performance issues.

(Def.'s App. Ex. CC.)

Plaintiffs respond that Cellular One is not accurately describing the Butler store history, which confirms their theory of disparate treatment: Stacey Felix (an employee under 40) was allowed to remain for two straight years before the quota requirement was enforced against her; and Allison Maziarz was terminated well outside the relevant time period for this case, which ends with the dismissal of the last of the three Plaintiffs on January 17, 2005 (not Cellular One's date of May 2006).

In addition, Plaintiffs contend that the favoritism was not limited to the Butler store but was a regional practice. For example, Christopher Frolian (born on November 14, 1977), who was an RSA and Assistant Store Manager at the Cranberry location, states that he repeatedly and consecutively failed to make his monthly sales quota, yet was not terminated as a result. (Pls.' App. Ex. 15.) Similarly, Jeremy Stouffer (born on May 11, 1980), states that he repeatedly and consecutively failed to make his monthly sales quota, yet was not terminated as a result. (Pls.'

App. Ex. 19.)

Cellular One contends that Stacey Felix, who worked as an RSA at the Butler store from August, 14, 2002 to December 13, 2004, was involuntarily terminated for failing to meet quota. Plaintiffs respond that Felix failed to make quota far in excess of five times, but was not fired until November 2004, thus confirming their claim of disparate treatment of older employees. (Pls.' App. Ex. 18.)  Cellular One points out that Felix's quota requirement was reduced or waived on several occasions for well-documented reasons including the death of her mother and because she was assisting Whitesell, her direct supervisor, who was on vacation.  (Docket No. 23 Ex. A at 3.)

Cellular One states that Jeremy Stouffer worked as an RSA at the Butler store from June 11, 2001 to May 14, 2006.  He voluntarily resigned his employment with the company citing a job change as his reason for leaving.  At the time of his resignation, Stouffer was on a Final Written Warning for failing to meet quota.  (Def.'s App. Ex. C.)  Plaintiffs respond that Stouffer failed to make quota far in excess of five times, but was not fired from Cellular One, thus confirming their claim of disparate treatment of older employees.  (Pls.' App. Ex. 19.)

Cellular One also notes that the Monthly Activations Reports were reviewed by the Regional Vice President, General Manager, Area Manager and Sales Directors.  (Menster Dep. at 35-36, 56; Def.'s App. Ex. C.)  The regional human resources department also reviewed these reports and determined which stage of the disciplinary process was applicable to each employee who failed to meet quota and invited comment from managers if they disagreed with the suggested disciplinary response.  All variances from the sales disciplinary process were tracked by human resources and all requests for terminations were reviewed and approved by the Regional Vice President, General Manager, Area Manager and Sales Directors and the corporate human resources department.  (Menster Dep. at 54-55, 60-62.)  Cellular One argues that Plaintiffs have no evidence that Bryan Clark did, or could have, manipulated the sales disciplinary process to wage a campaign of discrimination against Kildoo and Richter.

However, Plaintiffs have submitted the affidavits of Richard Popio, Barbara Sawyer and William Citeroni.  Popio states that he was a Market Manager overseeing the Butler location and

17

many other areas between March 1993 and June 2002, that he held the same position as Bryan

Clark and never had any issues with the Butler location or Mary Whitesell, and that:

> While employed by Dobson, I did personally observe and did personally experience Bryan Clark making comments and engaging in behavior showing a bias against the older workers and a bias in favor of the younger workers. This behavior included, but was not limited to, selectively enforcing the quota requirements against older workers, but not enforcing the quota requirements against the younger workers.

(Docket No. 28.)  Sawyer, a former Cellular One Account Executive at the Butler store, repeats

this allegation, as does Citeroni.  (Pls.' App. Ex. 14; Docket No. 27.)

Defendant argues that the Court is not required to accept the opponent's evidence if it is

"too incredible to be believed by reasonable minds."  *Losch v. Parkersburg*, 736 F.2d 903, 909

(3d Cir. 1984).  However, it has not explained why the statement, made by Sawyer, Popio and

Citeroni, that they personally observed Bryan Clark selectively enforcing the quota requirements

against younger workers is too incredible to be believed by reasonable minds.  The credibility of

these witnesses (as well as that of Bryan Clark, presumably) will have to be determined by the

jury at trial.  Thus, contrary to Cellular One's contention, Plaintiffs have submitted evidence

from which a trier of fact could conclude that the proffered reason for Kildoo and Richter's

terminations was a pretext for unlawful age discrimination.

Kildoo and Richter have pointed to such "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that

the employer did not act for [the asserted] non-discriminatory reasons."  *Fuentes*, 32 F.3d at 765

Therefore, with respect to the termination claims brought by Kildoo and Richter, the motion for

summary judgment will be denied.

<u>Whitesell's Termination Claim</u>

Whitesell alleges that her termination was an instance of age discrimination.  She was

over 40, qualified for her job, received an adverse employment decision and contends that she

was treated less favorably than similarly situated individuals not in the protected class.  As noted

above, Defendant concedes that all three Plaintiffs can state a prima facie case of age

discrimination.

Thus, the discussion turns to Defendant's proffered reason and Whitesell's evidence of pretext. Cellular One states that her employment was terminated as a result of a pattern of unacceptable behavior and poor job performance. Whitesell notes that North Region Human Resources Director Allison Menster testified that, as a result of her Final Warning, any further incident of unacceptable performance or behavior would have led to termination and in her case, the final straw was an incidence of unacceptable performance, namely failure to meet quota. (Menster Dep. at 103.)[16] Although Whitesell refers to this testimony to support her contention that she was terminated for failing to meet quota while others were treated more favorably, it supports Defendant's proffered reason for her termination: the failure to meet quota was a "last straw" following a series of other incidents.

As summarized above, Cellular One notes that: 1) Whitesell closed the store during posted business hours without management approval, violated the dress code, pre-sold a cell phone promotion without prior approval, failed to adequately account for inventory shortages and used (or permitted her employees to use) her point of sale login to make transactions on her husband's business account; 2) after receiving a Final Written Warning that any further incidents of unacceptable performance or behavior would lead to termination, she failed to meet her store quota having attained only 25% of its quota for the month of October 2004 and she was terminated. These incidents are all documented and Whitesell does not dispute the facts. (Def.'s App. Exs. F, G, H, J, L.) Defendant has met its burden of production.

Thus, the burden shifts back to Whitesell to point to evidence from which a trier of fact could conclude that the proffered reason is a pretext for unlawful age discrimination. She also proceeds along "*Fuentes* prong two." Specifically, she contends that other employees under 40 engaged in the same behavior that she was accused of yet were not subjected to discipline and termination. Cellular One contends that this evidence is insufficient to meet her burden.

As noted above, Whitesell attempts to challenge each decision by Cellular One: 1) she

---

[16]Pls.' App. Ex. 6.

explained that the store was closed for only three minutes due to an office equipment breakdown and supply shortage and stated that the store was unmanned and that no customers came in; 2) she claims that Andrew Verostik also had inappropriate piercing but was not disciplined and she contends that she had already agreed to remove her nose ring at the time she was written up for it; 3) she contends that the pre-sale of phones was within her discretion and that it was a good decision after customers traveled from away to the store; and 4) she contends that other individuals left their logins posted as she did but were not disciplined.

The Court of Appeals has emphasized that "we do not sit as a super-personnel department that reexamines an entity's business decisions." *Brewer v. Quaker State Oil Ref. Co.*, 72 F.3d 326, 332 (3d Cir. 1995) (citation omitted). Or, as stated somewhat differently, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765. Thus, whether Cellular One's discipline of Whitesell for these matters constituted good management is not relevant. In addition, Cellular One contends that Whitesell's attempts to compare herself to other employees fails because: 1) Verostik was under her supervision and she was the one who decided not to report his eyebrow piercing or discipline him for it; and 2) she did not merely post her login, but allowed a credit to be applied to her husband's business account through her own login.

Cellular One also observes that, although Whitesell contends that her infractions were fabricated and selectively enforced as a part of a campaign by Bryan Clark to terminate her employment (Whitesell Dep. at 51-52), the first two Written Warnings she received were issued by her direct supervisor, Kenneth Henke. (Def.'s App. Exs. F, G.) Moreover, Whitesell admitted that the nose piercing became an issue when the General Manager, Lisa Jenrette, brought it to Henke's attention. (Whitesell Dep. at 87-89.) Thus, Bryan Clark had no involvement in the first two disciplinary actions.

The next two Written Warnings were raised by Bryan Clark, but Jane Suber assisted him in investigating both infractions and administering the appropriate disciplinary action. (Def.'s

App. Ex. H; Suber Dep. at 24-28.)  Finally, the incident that led to her termination was the store's failure to meet quota for the month of October 2004.  Cellular One argues that this issue was not a matter of discretion for Bryan Clark, but was reviewed by all levels of management on a monthly basis.  Moreover, Cellular One notes that the store did not miss quota by an incremental amount, but achieved only 25% of its quota for the month.  Finally, Cellular One notes that all disciplinary actions taken against Whitesell were approved by the regional human resources department and/or Bryan Clark's managers after an independent review of the circumstances.  (Menster Dep. at 42-43, 50.)

Cellular One also contends that the termination history for Assistant Retail Sales Managers, such as Whitesell, likewise does not support Plaintiffs' theory that its policies, procedures and work rules were selectively enforced against Assistant Retail Sales Managers over the age of 40:

- 5 Assistant Retail Sales Mangers were involuntarily terminated between January 2002 and May 2006:

  o 2 Assistant Retail Sales Managers were under the age of 40
  o 2 Assistant Retail Sales Managers were over the age of 40
  o 1 Assistant Retail Sales Manger over the age of 40 was terminated as a result of corporate restructuring.

(Def.'s App. Ex. CC.)

Whitesell responds that she was dismissed for not making quota, that Bryan Clark supervised her directly, and that the sales records of Jeremy Stouffer, Chris Frolian, Sherri Michael and Heather Craig (all under 40) demonstrate that they missed quota repeatedly but she was the only Retail Sales Manager who was dismissed for missing quota when her records equaled or exceeded the others.  (Pls.' App. Exs. 20, 21.)

However, Whitesell cannot compare herself to other Retail Sales Managers who merely failed to meet their quota, because when she was terminated, Whitesell was on her Final Warning.  *See Simpson v. Kay Jewelers, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) (a plaintiff "cannot selectively choose her comparator" in order to satisfy her burden of demonstrating that similarly situated persons were treated differently).  An appropriate comparator would be a Retail Sales Manager who was under 40, was on a Final Warning, failed to meet quota and yet was not

terminated.  Whitesell has not pointed to any such individual.

Whitesell has failed to point to evidence from which the trier of fact could conclude that the record of performance and sales issues (which she admits) was a pretext for unlawful age discrimination.  Therefore, her age discrimination termination claim will be dismissed.

<u>Whitesell's Hostile Work Environment Claim</u>

Whitesell also alleges that she was subjected to a hostile work environment on the basis of her age.  Cellular One argues that this claim should be dismissed.

The United States Supreme Court has held that a plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).  The Court of Appeals has held that a plaintiff must demonstrate that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

*Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted).  Although the Third Circuit has not specifically held that a hostile work environment claim is available under the ADEA, a number of other courts of appeals have either held that such a claim is viable or have at least assumed without deciding that this is the case.  *See Kassner v. 2nd Avenue Delicatessen, Inc.*, 496 F.3d 229, 240 (2d Cir. 2007); *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005); *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005); *Peterson v. Scott County*, 406 F.3d 515, 523-24 (8th Cir. 2005); *Causey v. Balog*, 162 F.3d 795, 901 (4th Cir. 1998); *EEOC v. Massey-Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1249 n.7 (11th Cir. 1997); *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996). District courts in this Circuit have also assumed the viability of such a claim.  *See, e.g.*, *Fries v. Metropolitan Mgmt. Corp.*, 293 F. Supp. 2d 498, 504 (E.D. Pa. 2003), and *Glanzman v. Metropolitan Mgmt. Corp.*, 290 F. Supp. 2d 571, 581 (E.D. Pa. 2003), *both aff'd on other grounds*, 391 F.3d 506 (3d Cir. 2004); *Tumolo v. Triangle Pac. Corp.*, 46 F. Supp. 2d 410, 412 n.2 (E.D. Pa. 1999).

In *Faragher* and *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998), the Supreme Court held that an employer will be held vicariously liable when a supervisor's harassment culminates in a "tangible employment action" such as firing, demotion or undesirable reassignment, but that otherwise the employer can present a defense that it had a readily accessible and effective sexual harassment policy and that the plaintiff unreasonably failed to avail herself of it. The burden to establish this defense by a preponderance of the evidence falls on the employer. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

Cellular One argues that: 1) Whitesell failed to avail herself of its policy against harassment in the workplace; and 2) the incidents to which she points do not rise to the level of a hostile work environment. The Court need not address the first argument, because the second one is availing.

Cellular One argues that she cannot show the type of severe or pervasive conduct required to establish a hostile work environment claim. Teasing, offhand comments and isolated incidents do not rise to the level necessary to maintain such a claim. *Faragher*, 524 U.S. at 788. She has listed the following examples over an approximate two-year period: 1) Bryan Clark made derogatory comments such as suggesting that she "better get glasses" (Compl. ¶ 36); 2) he would bring up an event or television show or movie from the past and say "you're old enough to remember that" or "you were a kid back then"; or 3) he turned to her when she was walking behind him and said "come on, old lady, keep up" (Whitesell Dep. at 43-45). These examples are the kind that courts have found do not meet the severe or pervasive conduct required to establish such an environment. *Racicot*, 414 F.3d at 678 (isolated comments about Racicot's age such as that she "shouldn't be working at [her] age" were neither severe nor pervasive enough to create an objectively hostile work environment); *Peterson*, 406 F.3d at 524 (supervisor made regular references to "old ladies," once did not allow her to participate in a training session because it was "too hard to train old ladies" and once commented that she "didn't have the right parts" to fill in shifts–all deemed to be isolated incidents, teasing and offhand comments that might be offensive but did not constitute harassment). Therefore, her hostile work environment claim will be dismissed.

## V. CONCLUSION

Based on the foregoing, the motion for summary judgment filed by Defendant shall be granted as to the claims brought by Mary Whitesell and denied as to the claims brought by Cynthia Kildoo and Leann Richter.  An appropriate order follows.


<u>s/ David Stewart Cercone</u>
David Stewart Cercone
United States District Judge


cc:    John David Newborg, Esquire
428 Forbes Avenue
Suite 220
Pittsburgh, PA 15219

Patricia A. Monahan, Esquire
Danielle M. Vugrinovich, Esquire
Marshall Dennehey Warner
   Coleman & Goggin
U.S. Steel Tower, Suite 2900
600 Grant Street
Pittsburgh, PA 15219